ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 14-1103, 14-1104, 14-1105 (Consolidated)

---

TransCanada Power Marketing Ltd., Petitioner,

v.

Federal Energy Regulatory Commission, Respondent, and

Essential Power Massachusetts, LLC, *et al.*, Intervenors.

---

# JOINT INITIAL BRIEF OF TRANSCANADA POWER MARKETING LTD. AND THE RETAIL ENERGY SUPPLY ASSOCIATION

---

On Petition for Review from the Federal Energy Regulatory Commission

James D'Andrea
TransCanada USA Services Inc.
110 Turnpike Road
Suite 300
Westborough, MA 01581
Tel: (508) 475-6088

Kenneth Wiseman
Mark Sundback
Allison Hellreich
William Rappolt
Andrews Kurth LLP
1350 I Street, NW, Suite 1100
Washington, DC 20005
Tel: (202) 662-2700
E-mail:  kwiseman@andrewskurth.com

Counsel for Petitioner TransCanada
Power Marketing Ltd.

WAS:213833.8

Elizabeth W. Whittle
Nixon Peabody, LLP
401 Ninth Street, N.W.
Suite 900
Washington, DC 20004
202-585-8338
ewhittle@nixonpeabody.com
Counsel for
The Retail Energy Supply Association

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.    Parties and Amici**

> **1.    Parties, Intervenors, and Amici before the Federal Energy Regulatory Commission**

> FERC Docket No. ER13-2266
> Algonquin Gas Transmission, LLC and Maritimes & Northeast Pipeline, L.L.C.
> Electric Power Supply Association
> Essential Power Massachusetts, LLC
> Exelon Corp.
> H.Q. Energy Services (U.S.) Inc.
> ISO New England Inc.
> Maine Public Utilities Commission
> Massachusetts Department of Public Utilities
> National Grid USA
> New England Power Generators Association Inc.
> New England Power Pool Participants Committee
> New England States Committee on Electricity
> Northeast Utilities Serviced Co.
> NRG Companies
> PSEG Companies
> Retail Energy Supply Association
> TransCanada Power Marketing Ltd.
> Vermont Public Service Board
> Vitol Inc.

> FERC Docket No. ER13-1851
> Algonquin Gas Transmission, LLC and Maritimes & Northeast Pipeline, L.L.C.
> Brookfield Energy Marketing, LP
> Calpine Corp.
> Capital Power Corp.
> Conservation Law Foundation
> Consolidated Edison Energy, Inc.
> Dominion Resources Services, Inc.
> Electric Power Supply Association
> Entergy Nuclear Power Marketing
> Exelon Corp.

i

GDF Suez Energy Marketing NA, Inc.
Hess Corp.
H.Q. Energy Services (U.S.) Inc.
Industrial Energy Consumer Group
ISO New England Inc.
Maine Public Utilities Commission
Massachusetts Department of Public Utilities
National Grid USA
Natural Gas Supply Association
NEPOOL Industrial Customer Coalition
New England Local Distribution Companies
New England Power Generators Association Inc.
New England Power Pool Participants Committee
New England States Committee on Electricity
Northeast Utilities Service Co.
NRG Companies
PPL EnergyPlus, LLC
PSEG Companies
Repsol Energy North America Corp.
Retail Energy Supply Association
Shell Energy North America (U.S.), L.P.
TransCanada Power Marketing Ltd.
The United Illuminating Company
Vermont Public Service Board
Verso Paper Corp.
Vitol Inc.

## 2. Parties, Intervenors, and Amici before this Court

Federal Energy Regulatory Commission
ISO New England Inc.
Essential Power Massachusetts, LLC
Essential Power, LLC
Essential Power Newington, LLC
PSEG Power LLC
PSEG Energy Resources & Trade LLC
PSEG Power Connecticut, LLC
New England Power Generators Association, Inc.
Retail Energy Supply Association
TransCanada Power Marketing Ltd.

WAS:213833.8

**B.    Rulings Under Review**

The rulings of the Federal Energy Regulatory Commission under review are

identified as follows:

1.    *ISO New England Inc.*, "**Order Conditionally Accepting Tariff Revisions**," 144 FERC ¶ 61,204 (Sept. 16, 2013) ("Order Accepting Tariff Revisions") (JA __);

2.    *ISO New England Inc.*, "**Order Denying Rehearing**," 147 FERC ¶ 61,026 (Apr. 8, 2014) ("Order Denying Rehearing of Tariff Revisions") (JA __);

3.    *ISO New England Inc.*, "**Order Conditionally Accepting Bid Results**," 145 FERC ¶ 61,023 (Oct. 7, 2013) (*"Order Accepting Bid Results"*) (JA __); and

4.    *ISO New England Inc.*, "**Order Denying Rehearing**," 147 FERC ¶ 61,027 (Apr. 8, 2014) ("Order Denying Rehearing of Bid Results") (JA __).

**C.    Related Cases**

The orders under review are the subject of the Petition for Review in these

consolidated cases (Nos. 14-1103, 14-1104, 14-1105).  The underlying cases have

not previously been before this Court or any other court.

## CORPORATE DISCLOSURE STATEMENT OF TRANSCANADA POWER MARKETING LTD.

TransCanada Power Marketing Ltd. ("TCPM"), a Delaware corporation, is a member of the New England Power Pool and a market participant in ISO New England Inc. with the authority to sell power at market based rates and is active in the purchase and sale of wholesale bulk power within the New England Power Pool region. TCPM's principal place of business is located in the city of Westborough, Massachusetts. TCPM is a wholly owned subsidiary of TransCanada PipeLine USA Ltd., which in turn is a wholly owned subsidiary of TransCanada PipeLines Limited, a Canadian public company incorporated in 1951 by a Special Act of Parliament of Canada and continued on June 1, 1979 under the Canada Business Corporations Act. There is no publicly held company directly owning ten percent (10%) or more of TCPM stock.

iv

## CORPORATE DISCLOSURE STATEMENT OF
## THE RETAIL ENERGY SUPPLY ASSOCIATION

The Retail Energy Supply Association ("RESA") is a non-profit trade association of independent corporations that are involved in the competitive supply of electricity.  RESA and its members are actively involved in retail electricity markets throughout the United States, including retail markets in each of the Federal Energy Regulatory Commission-approved Regional Transmission Organizations/Independent System Operators, including ISO New England, Inc. RESA does not have any parent companies and no publicly-held company has a 10% or greater ownership interest in RESA.  RESA does not issue stock.

WAS:213833.8

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT OF TRANSCANADA POWER MARKETING LTD. ................................................................................ iv

CORPORATE DISCLOSURE STATEMENT OF THE RETAIL ENERGY SUPPLY ASSOCIATION ............................................................................ v

TABLE OF AUTHORITIES* ................................................................. viii

GLOSSARY OF ABBREVIATIONS .......................................................... xi

JURISDICTIONAL STATEMENT ............................................................. 1

STATUTES AND REGULATIONS ............................................................ 3

STATEMENT OF ISSUES ....................................................................... 4

STATEMENT OF CASE AND FACTS ....................................................... 6

SUMMARY OF ARGUMENT ................................................................. 14

STANDING ........................................................................................... 20

ARGUMENT ......................................................................................... 21

    A.    Standard of Review ...................................................................... 21

    B.    There Was No Evidence in the Record To Allow FERC to Determine Whether The Cost-Based Winter Reliability Program and Resulting Rates Were Just and Reasonable ....................................................... 22

    C.    FERC Erred In Rejecting TCPM's Argument That the Large Disparity Between the Estimated and Actual Costs of the Program and Suppliers' Bids Demonstrated That The Program Was Flawed, Not Just and Reasonable, and Did Not Produce Just And Reasonable Rates ................. 32

vi

D.  FERC Acted Arbitrarily and Capriciously, Failed to Engage in Reasoned Decision-making and Abused Its Discretion In Finding That ISO-NE Complied With The Tariff Requirement To Consider The "Cost (dollars/MWh) of providing the oil storage and demand response services." .................................................................................37

E.  FERC Acted Arbitrarily and Capriciously, Failed to Engage in Reasoned Decision-making and Abused Its Discretion in Failing to Address TCPM's Argument that FERC Should Have Determined Suppliers' Profit Margins and Risk Premiums Through Cost-Based Ratemaking, and That Its Failure to Do So Here Was Unreasonable...............................................................41

F.  FERC Acted Arbitrarily and Capriciously, Failed to Engage in Reasoned Decision-Making and Abused Its Discretion in Failing to Determine Whether ISO-NE Had Met its Burden of Proof under FPA Section 205 to Show That the Program Costs Should be Allocated to Transmission Owners. .................................................................................43

G.  FERC Acted in Contravention of Cost Causation/Cost Responsibility Principles When it Allocated the Costs of the Program to Load Serving Entities....................................................................47

H.  FERC Acted Arbitrarily and Capriciously, Failed to Engage in Reasoned Decision-Making and Abused Its Discretion by Dismissing the Significant Impact on Consumers That Will Occur by Allocating the Program Costs to Real-Time Load Obligation. ..................................................................50

I.  FERC Acted Arbitrarily and Capriciously, Failed to Engage in Reasoned Decision-Making and Abused Its Discretion in Failing to Consolidate the Proceedings in Docket Nos. ER13-1851 and ER13-2266. ........................54

CONCLUSION ..................................................................56

CERTIFICATE OF COMPLIANCE....................................................58

CERTIFICATE OF SERVICE .......................................................59

vii

# TABLE OF AUTHORITIES*

**Page(s)**

## FEDERAL CASES

*Am. Pub. Gas Ass'n v. FPC*,
  567 F.2d 1016 (D.C. Cir. 1977).........................................................................22

*AT&T Corp. v. FCC*,
  236 F.3d 729 (D.C. Cir. 2001).........................................................................21

*\*Atl. City Elec. Co. v. FERC*,
  295 F.3d 1 (D.C. Cir. 2002).......................................................................22, 43

*\*Canadian Ass'n of Petroleum Producers v. FERC*,
  254 F.3d 289 (D.C. Cir. 2001)................................................................29, 43, 53

*City of Bethany v. FERC*,
  727 F.2d 1131 (D.C. Cir. 1984).......................................................................43

*\*City of Charlottesville v. FERC*,
  661 F.2d 945 (D.C. Cir. 1981)...........................................................23, 24, 27, 29

*Colorado Interstate Gas Co. v. FPC*,
  324 U.S. 581 (1945)...............................................................................30, 31, 32

*Florida Gas Transmission Co. v. FERC*,
  604 F.3d 636 (D.C. Cir. 2010).......................................................................21

*Florida Mun. Power Agency v. FERC*,
  315 F.3d 362 (D.C. Cir. 2003).......................................................................55

*FPC v. Texaco*,
  417 U.S. 380 (1974)..................................................................................23, 29

*Authorities upon which we chiefly rely are marked with asterisks.

viii

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................20

*Maine Pub. Utilities Comm'n v. FERC*,
    454 F.3d 278 (D.C. Cir. 2006)....................................................4, 43

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................21

*\*Nantahala Power & Light Co. v. Thornburg*,
    476 U.S. 953 (1986)..................................................................45, 50

*\*Narragansett Electric Co. v. Burke*,
    381 A. 2d 1358 (R.I. 1977), *cert. denied*, 435 U.S. 972 (1978)..................45, 50

*Natural Res. Def. Council v. EPA*,
    822 F.2d 104 (D.C. Cir. 1987).......................................................21

*New York Reg'l Interconnect, Inc. v. FERC*,
    634 F.3d 581 (D.C. Cir. 2011).......................................................20

*OXY USA, Inc. v. FERC*,
    64 F.3d 679 (D.C. Cir. 1995).........................................................44

*\*Pac. Gas & Elec. Co. v. FERC*,
    306 F.3d 1112 (D.C. Cir. 2002).......................... 21, 22, 23, 24, 25, 29, 30, 32, 42

*\*Washington Gas Light Co. v. FERC*,
    532 F.3d 928 (D.C. Cir. 2008)...................................................24, 29

**ADMINISTRATIVE CASES**

*Empire District Elec. Co.*,
    133 FERC ¶ 61,004 (2010)............................................................54

*ISO New England, Inc.*,
    113 FERC ¶ 61,220 (2005).........................................................6, 53

*ISO New England Inc.*,
    144 FERC ¶ 61,204 (2013).......................... 1, 8, 9, 10, 25, 46, 47, 48, 49, 50, 52

WAS:213833.8

*ISO New England Inc.*,
145 FERC ¶ 61,023 (2013)................................................................2, 10, 41, 55

*ISO New England Inc.*,
147 FERC ¶ 61,026 (2014)................................... 1, 12, 13, 25, 30, 35, 47, 48, 49

*ISO New England Inc.*,
147 FERC ¶ 61,027 (2014)...................... 2, 12, 13, 25, 30, 31, 35, 36, 39, 40, 42

*S. Carolina Elec. & Gas Co.*,
132 FERC ¶ 61,043 (2010)................................................................................54

## STATUTES AND REGULATIONS

5 U.S.C. § 706 (2012) .............................................................................21

16 U.S.C. § 824d (2012) ................................................1, 2, 6, 14, 22, 35

16 U.S.C. § 825*l* (2012) ....................................................................1, 20

18 C.F.R. § 35.13 (2014) .......................................................................25

WAS:213833.8

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Analysis Group | Analysis Group, Inc. |
| APA | Administrative Procedure Act |
| Emergency Amendments Filing | *ISO New England Inc.*, ISO-NE Emergency Amendments to Winter Reliability 2013-14 Program, Docket No. ER13-1851-001 (filed Aug. 9, 2013) |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| ISO-NE | ISO New England Inc. |
| ISO-NE Tariff Filing | *ISO New England Inc.*, New England Power Pool Participants Committee Submits Tariff Filing, Docket No. ER13-1851 (filed June 28, 2013) |
| Market Participant | Defined in ISO-NE's Tariff as "a participant in the New England Markets (including a FTR-Only Customer) that has executed a Market Participant Service Agreement, or on whose behalf an unexecuted Market Participant Service Agreement has been filed with [FERC]." |
| MWh | Megawatt-hour |
| Order Accepting Bid Results | *ISO New England Inc.,* "Order Conditionally Accepting Bid Results," 145 FERC ¶ 61,023 (Oct. 7, 2013) |
| Order Accepting Tariff Revisions | *ISO New England Inc.*, "Order Conditionally Accepting Tariff Revisions," 144 FERC ¶ 61,204 (Sept. 16, 2013) |

xi

| | |
|---|---|
| Order Denying Rehearing of Bid Results | *ISO New England Inc.*, "Order Denying Rehearing," 147 FERC ¶ 61,027 (Apr. 8, 2014) |
| Order Denying Rehearing of Tariff Revisions | *ISO New England Inc.*, "Order Denying Rehearing," 147 FERC ¶ 61,026 (Apr. 8, 2014) |
| Posturing | Posturing allows ISO-NE to "constrain or hold-off-line (posture) pool-scheduled generating resources in the Energy Market in order to maintain operating reserves during or in anticipation of shortage situations. Generating resources that are postured for the purpose of maintaining sufficient operating reserves receive Real-Time Operating Reserves Credits . . ." Winter 2005-2006 Order, 113 FERC ¶ 61,220 at P 7. |
| Program | ISO-NE's 2013-2014 Winter Reliability Program |
| Real Time Load Obligation | Defined as follows in ISO-NE's Tariff: "Real-Time Load Obligation – Each Market Participant shall have for each hour a Real-Time Load Obligation for energy at each Location equal to the MWhs of load, where such MWhs of load shall include External Transaction sales and shall have a negative value, at that Location, adjusted for any applicable internal bilateral transactions which transfer Real-Time load obligations." |
| Regional Network Load | Defined in ISO-NE's Tariff as, inter alia, "the load that a Network Customer designates for Regional Network Service under Part II.B of [ISO-NE's Open Access Transmission Tariff]." |
| RESA | The Retail Energy Supply Association |

WAS:213833.8

| | |
|---|---|
| RESA Request for Rehearing Docket No. ER13-1851 | *ISO New England Inc.*, Request for Rehearing of the Retail Energy Supply Association, Docket No. ER13-1851 (filed Oct. 16, 2013) |
| Results of Bidding Filing | *ISO New England Inc.*, Filing of Results of Bidding in Winter 2013-14 Reliability Program, Docket No. ER13-2266 (filed Aug. 26, 2013) |
| Tariff | ISO-NE's Transmission, Markets and Services Tariff |
| TCPM | TransCanada Power Marketing Ltd. |
| TCPM Request for Rehearing Docket No. ER13-1851 | *ISO New England Inc.*, Request for Rehearing of TransCanada Power Marketing Ltd., Docket No. ER13-1851 (filed Oct. 16, 2013) |
| TCPM Request for Rehearing Docket No. ER13-2266 | *ISO New England Inc.*, Request for Rehearing of TransCanada Power Marketing Ltd., Docket No. ER13-2266 (filed Nov. 6, 2013) |
| Winter 2005-2006 Order | *ISO New England, Inc.*, 113 FERC ¶ 61,220 (2005) |

WAS:213833.8

## JURISDICTIONAL STATEMENT

On September 16, 2013, pursuant to Section 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d (2012), the Federal Energy Regulatory Commission ("FERC") issued an order in its Docket No. ER13-1851 conditionally accepting amendments ISO New England Inc. ("ISO-NE") had proposed to its Tariff to establish a Winter Reliability Program ("the Program") for the 2013-2014 winter. *ISO New England Inc.*, 144 FERC ¶ 61,204 (2013) ("Order Accepting Tariff Revisions") (JA __). On October 16, 2013, TCPM and RESA each timely sought rehearing of that order. *ISO New England Inc.*, Request for Rehearing of TransCanada Power Marketing Ltd., Docket No. ER13-1851 (filed Oct. 16, 2013) ("TCPM Request for Rehearing Docket No. ER13-1851") (JA __); *ISO New England Inc.*, Request for Rehearing of the Retail Energy Supply Association, Docket No. ER13-1851 (filed Oct. 16, 2013) ("RESA Request for Rehearing Docket No. ER13-1851") (JA __). On April 8, 2014, FERC denied rehearing. *ISO New England Inc.*, 147 FERC ¶ 61,026 (2014) ("Order Denying Rehearing of Tariff Revisions") (JA __). TCPM and RESA each timely filed a petition for review of the orders in FERC Docket No. ER13-1851 in this Court on June 6, 2014. Section 313(b) of the FPA, 16 U.S.C. § 825*l*(b) (2012), provides that a party that is aggrieved by a FERC order may seek judicial review in this court. TCPM

1

and RESA were parties to the proceeding below, timely filed rehearing, and are aggrieved by the final orders as described *infra* at 20.

On October 7, 2013, under FPA Section 205, 16 U.S.C. § 824d, FERC issued an order in its Docket No. ER13-2266 conditionally accepting the results of a bidding process by which suppliers offered prices at which they would act as suppliers in the Program. *ISO New England Inc.*, 145 FERC ¶ 61,023 (2013) ("Order Accepting Bid Results") (JA __). On November 6, 2013, TCPM timely sought rehearing of that order. *ISO New England Inc.*, Request for Rehearing of TransCanada Power Marketing Ltd., Docket No. ER13-2266 (filed Nov. 6, 2013) ("TCPM Request for Rehearing Docket No. ER13-2266") (JA __). On April 8, 2014, FERC denied rehearing. *ISO New England Inc.*, 147 FERC ¶ 61,027 (2014) ("Order Denying Rehearing of Bid Results") (JA __). On June 6, 2014, TCPM timely filed a Petition for Review of the orders in FERC Docket No. ER13-2266 in this Court. TCPM was a party to the proceeding below, timely filed rehearing, and is aggrieved by the final orders as described *infra* at 20.

2

## STATUTES AND REGULATIONS

The relevant statutory provisions are reproduced in a separate Statutory Addendum submitted herewith.

WAS:213833.8

## STATEMENT OF ISSUES

1.      Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, and/or failed to base its decisions on substantial evidence by finding that the cost-based Program and resulting rates were just and reasonable when there was no evidence in the record of either FERC docket of the costs underlying the rates.

2.      Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, and/or abused its discretion by: (i) refusing to establish a record to determine the reasons for the large disparity between the Program's estimated costs and actual rates charged under the Program and (ii) rejecting TCPM's argument that the disparity constituted evidence that the Program was flawed, not just and reasonable, and did not result in just and reasonable rates.

3.      Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, or abused its discretion by finding that ISO-NE complied with its Tariff that required it to consider suppliers' costs of providing oil storage and demand response services.

4

4.     Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, or abused its discretion by failing to address TCPM's argument that FERC should have determined suppliers' profit margins and risk premiums through traditional cost-based ratemaking mechanisms, and whether its failure to make those determinations was an abuse of its discretion and/or in violation of its obligations under Section 205 of the FPA.

5.     Whether FERC acted in contravention of FPA Section 205 and decades of judicial FERC precedent when it failed to examine whether ISO-NE's proposal to allocate the Program's costs to Regional Network Load, *i.e.*, transmission owners, was just and reasonable, and instead substituted its own differing methodology under which it allocated the Program's cost to Real Time Load Obligation, *i.e.*, load serving entities.

6.     Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, or abused its discretion by allocating the Program's costs to load serving entities without considering the significant impact on consumers that would occur in the long run from such an allocation of the Program's costs.

5

7.     Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, or abused its discretion by relying on *ISO New England, Inc.*, 113 FERC ¶ 61,220 (2005) ("Winter 2005-2006 Order") to support its decision to allocate Program costs to load serving entities without addressing TCPM's argument as to why reliance on the Winter 2005-2006 Order failed to support the justness and reasonableness of the Program.

8.     Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, or abused its discretion by failing to consolidate the proceedings in FERC Docket Nos. ER13-1851 and ER13-2266 and/or failing to consider the issues in both dockets conjunctively rather than independently of each other.

## STATEMENT OF CASE AND FACTS

On June 28, 2013, pursuant to FPA Section 205, 16 U.S.C. § 824d, ISO-NE and the New England Power Pool Participants Committee filed proposed revisions to Market Rule 1 of ISO-NE's Tariff in FERC Docket No. ER13-1851. *ISO New England Inc.*, New England Power Pool Participants Committee Submits Tariff Filing, Docket No. ER13-1851 (filed June 28, 2013) ("ISO-NE Tariff Filing") (JA __). The revisions were proposed to establish measures to obtain services to assure reliability for the 2013-14 winter. The Program consisted of four components: a new demand response program, an oil inventory service, incentives for dual-fuel

6

generating units, and market monitoring changes.  The Program anticipated that suppliers would provide up to the equivalent of 2.4 million Megawatt-hours ("MWh") of fuel diverse energy through demand response and establishment of an oil inventory by oil-fired generators selected as suppliers in the Program.  The new services were not optional; customers had to buy and pay for them.  ISO-NE proposed that the costs of the Program be allocated to Regional Network Load (*i.e.*, transmission owners).  ISO-NE also proposed that it be given discretion to accept or reject bids by entities that wished to be suppliers under the Program based on non-cost factors.  Nonetheless, the oil inventory service component of the Program required cost-based, not market-based, pricing.  Thus, each supplier's bid was supposed to be based upon its actual costs of providing the reliability service, as well as a competitive profit margin and risk premium.  *See ISO New England, Inc.*, ISO-NE Answer to Protest and Comments, Docket No. ER13-1851 at 8 (filed Aug. 6, 2013) (ISO-NE "has stated that it expects bids to be based on the costs estimated by the Analysis Group, plus a competitive profit margin and risk premium.") (JA __).  The Program contemplated that each supplier selected for the Program would be compensated at its price as bid and did not include a single price auction mechanism as occurs in ISO-NE's energy, capacity and ancillary services markets that operate under market-based pricing.

7

On August 9, 2013, ISO-NE filed emergency amendments to the Program. *ISO New England Inc.*, ISO-NE Emergency Amendments to Winter Reliability 2013-14 Program, Docket No. ER13-1851-001 (filed Aug. 9, 2013) ("Emergency Amendments Filing") (JA __).  ISO-NE explained that the amendments were intended to reduce risks for Market Participants in order to "ensure that oil-fired generators increase their fuel oil inventory."  Emergency Amendments Filing at 2 (JA __).  Reducing risk reduces cost and therefore the Emergency Amendments were expected to reduce prices and increase quantities offered by bidders.  Both the ISO-NE Tariff Filing and the Emergency Amendments Filing required ISO-NE to submit to FERC the results of the bidding to provide demand response and oil inventory services.

On September 16, 2013, FERC issued an order that found that the Program was an appropriate, time-limited solution for the challenges to reliability in ISO-NE.  Order Accepting Tariff Revisions at P 21 (JA __).  FERC acknowledged that ISO-NE had substantial discretion in accepting bids, but stated that the Program target acted as a limiting factor, and that the procurement decisions under the Program were subject to FERC review.  *Id.* at PP 31-32 (JA __).  FERC also noted that a market-based solution would have been preferable to the out-of-market cost-based solution represented by the Program.  Nonetheless, it found that "the importance of ensuring reliability in New England this coming winter and the late

8

date at which ISO-NE has developed this proposed solution" warranted its acceptance for the limited period. *Id.* at P 42 (JA __). FERC found that the mechanism under which suppliers would be compensated at their bid price was just and reasonable because of the need to protect reliability and the interim nature of the Program. *Id.* at P 54 (JA __). FERC, however, rejected ISO-NE's proposal that the costs of the Program be allocated initially to Regional Network Load (*i.e.*, transmission owners). *Id.* at PP 70-76 (JA __). It held instead that the costs of the Program should be allocated initially to Real-Time Load Obligation (*i.e.*, load serving entities).

On August 26, 2013, ISO-NE filed its Results of Bidding Filing in Docket No. ER13-2266. *ISO New England Inc.*, Filing of Results of Bidding in Winter 2013-14 Reliability Program, Docket No. ER13-2266 (filed Aug. 26, 2013) ("Results of Bidding Filing") (JA __). ISO-NE proposed to accept bids equivalent to 1.995 million MWh at a price of $78.8 million. Results of Bidding Filing at 3 (JA __). This compares to ISO-NE's original estimate that the cost of the Program would be in a range of $16 to $43 million for 2.4 million MWh. ISO-NE Tariff Filing, Joint Testimony of Ethier and Brandien at 29 (JA __). Thus, the bid results ISO-NE asked FERC to accept were for 83.1% of the targeted level of desired service at a price of 1.8 to almost 5 times the original estimate of the cost for 100% of the service. On October 7, 2013, FERC issued an order conditionally accepting

9

the bid results from ISO-NE's Program, subject to a compliance filing.  Order

Accepting Bid Results at P 23 (JA __).   FERC based its acceptance in part on

ISO-NE's "good faith effort" to develop an estimate for the Program, and FERC

directed ISO-NE to make a compliance filing that described its evaluation process.

*Id.* at PP 25, 30 (JA __).

On October 16, 2013, TCPM and RESA each filed a request for rehearing of

the Order Accepting Tariff Revisions, and on November 6, 2013, TCPM filed a

request for rehearing of the Order Accepting Bid Results.  TCPM argued that there

was no evidence in the record of Docket No. ER13-1851 of the costs of the

services being sought and that FERC therefore could not examine the underlying

reasonableness of estimates or bids being submitted for the service being offered.

TCPM further argued that there was no evidence in the record to determine what

risk factors and profit margins would be just and reasonable to include in suppliers'

offers as a predicate to finding that the Program itself was just and reasonable.

TCPM argued that FERC's approval of the Program thus was in contradiction of

FERC's obligations under FPA Section 205 because FERC had to examine the

costs, risks and profits given that the Program's rates were to be cost-based

reflecting suppliers' costs.  TCPM Request for Rehearing Docket No. ER13-1851

at 12-18 (JA __); TCPM Request for Rehearing Docket No. ER13-2266 at 8-12

(JA __).  TCPM contended that FERC's orders did not constitute a reasoned

10

determination of whether the Program and the resulting rates were just and reasonable given that FERC did not know the costs to provide service or the associated risks and profit margins suppliers added on top of their costs.  TCPM Request for Rehearing Docket No. ER13-1851 at 12-18 (JA __);  TCPM Request for Rehearing Docket No. ER13-2266 at 8-12 (JA __).  TCPM also argued that FERC erred in accepting the bids in its Order Accepting Bid Results because ISO-NE did not comply with the criteria in its own Tariff for evaluating the bids and that FERC inappropriately rejected protestors' arguments that the disparity between the cost estimate and the total price of the Program suggested that the price of the Program and the resulting rates were not just and reasonable.  TCPM Request for Rehearing Docket No. ER13-1851 at 12-18 (JA __);  TCPM Request for Rehearing Docket No. ER13-2266 at 12-17 (JA __).   TCPM also argued that FERC erred in allocating the Program's costs to load serving entities without first finding that ISO-NE's proposal to allocate the Program's costs to transmission owners was unjust and unreasonable, and without considering protestors' arguments regarding the need for costs to be passed through to customers in order to avoid increased costs to consumers in the future to account for this increased risk to load serving entities.  TCPM Request for Rehearing Docket No. ER13-1851 at 18-21 (JA __).   RESA made similar arguments and stated that FERC erred in substituting its own proposal without finding that the rate, as proposed by ISO-NE,

11

was unjust and unreasonable, by ignoring the stakeholder process, and by ignoring protestors' comments regarding the cost allocation mechanism. RESA Request for Rehearing Docket No. ER13-1851 (JA __). TCPM also argued that FERC erred in failing to consolidate the two dockets because FERC could not determine in Docket No. ER13-1855 whether the Program was just and reasonable without determining whether the cost-based rates, which would be determined by supplier bids without cost-based breakdowns, were just and reasonable. The cost-based rates were separately at issue in Docket No. ER13-2266. TCPM Request for Rehearing Docket No. ER13-1851 at 22 (JA __); TCPM Request for Rehearing Docket No. ER13-2266 at 17-18 (JA __).

On April 8, 2014, FERC denied the requests for rehearing in both dockets. Order Denying Rehearing of Tariff Revisions (JA __); Order Denying Rehearing of Bid Results (JA __). In its Order Denying Rehearing of Tariff Revisions, FERC stated that it had appropriately considered the costs of the Program as one of many factors, and appropriately balanced other factors such as the need for reliability. Order Denying Rehearing of Tariff Revisions at PP 15-18 (JA __). FERC rejected TCPM's arguments that FERC had to investigate the reasons for the disparity between the estimated cost of the Program and the prices bid by suppliers by stating that it considered a range of factors in determining whether the Program was just and reasonable, and the fact that the bid prices were higher than the

12

estimate "does not alone demonstrate that the Program design is unjust and unreasonable." *Id.* at P 21 (JA ___). FERC rejected TCPM's and RESA's arguments regarding its decision to allocate the costs of the Program to load serving entities by broadly citing cost-causation principles and citing to its decision accepting ISO-NE's 2005-2006 winter reliability program, *id.* at PP 24-27 (JA ___), even though in that case ISO-NE had proposed allocating costs to load serving entities, which restricted FERC's ability to consider different allocation methods. *See infra* at 46-47, 52-54. FERC also denied TCPM's request for consolidation. Order Denying Rehearing of Tariff Revisions at P 28 (JA ___).

In the Order Denying Rehearing of Bid Results, FERC stated that ISO-NE reasonably followed its Tariff in considering the cost of providing the service. Order Denying Rehearing of Bid Results at P 14 (JA ___). FERC also stated, once again, that it balanced cost with other factors, and that the fact that the actual prices bid exceeded the cost estimate did not make the bid results unjust and unreasonable. *Id.* at P 15 (JA ___). FERC found that the disparity between estimated costs and the prices bid did not indicate that there were excessive profit margins, and that TCPM's arguments regarding the justness and reasonableness of the Program were better addressed in Docket No. ER13-1851. *Id.* at PP 15, 17 (JA ___).

13

## SUMMARY OF ARGUMENT

Under FPA Section 205, FERC may only approve rates and charges of public utilities, and rules and regulations pertaining to those rates, that are just and reasonable. 16 U.S.C. § 824d(a). FERC failed to fulfill this statutory obligation by failing to make its decisions here based on substantial evidence, and acting arbitrarily and capriciously, by accepting the Program and its resulting rates without having any evidence upon which to determine whether the Program's design or the resulting rates were in fact just and reasonable. Rather than address TCPM's arguments regarding the insufficiency of evidence in the records of both dockets concerning the costs of the services including reasonable risk premiums and profit margins suppliers built into their offers, FERC instead chose to assert that it had appropriately balanced competing factors (without specificity), one of which was cost, while ignoring the reality: the Program was proposed to be cost-based, not market-based, and without obtaining and analyzing any evidence related to cost issues, such as the cost of service, the return on equity, risk, and the overall rate of return, FERC could not ensure that the Program and resulting cost-based rates were just and reasonable. Even if FERC properly could consider non-cost factors, it could not consider those factors in a vacuum that lacked evidence of the actual costs of the services. Offers from suppliers by themselves, especially in a

14

market that had not been shown to be competitive, *i.e.*, one in which prices could not be impacted by the exercise of market power, are not evidence of cost.

FERC's dismissal of TCPM's argument regarding the disparity between the estimated costs of the Program and the prices offered by suppliers similarly was arbitrary and capricious, not based on substantial evidence, and not based on reasoned decision-making, because FERC failed to undertake any examination of the reasons for the disparity. In particular, FERC did not review whether the disparity was caused by suppliers including excessive, unjust and unreasonable risk premiums and/or profit margins in their offers. An examination of the evidence in the record suggests that between 45% and 83% of the overall charges of the Program may have been due to suppliers' adders for risk premiums and/or profit margins. At a minimum, FERC is obligated to examine evidence to determine whether the risk premiums and profit margins were the cause of the disparity and, if so, whether the amounts sought in the offers would render the rate, as a cost-based rate, unjust and unreasonable. Unfortunately, there was no evidence in the record for FERC to review. FERC also failed to examine the anecdotal evidence in the record that suggested that the disparity demonstrated that the Program's rates were unjust and unreasonable, instead repeatedly relying upon a conclusory statement that the disparity alone did not render the Program and/or the rates unjust and unreasonable. Yet, there was nothing in the record that could have led FERC

15

to rationally conclude the Program and/or the rates were just and reasonable which FERC must do regardless of Protestors' complaints.

FERC also erred in ruling that ISO-NE complied with its Tariff which required ISO-NE to consider the costs of providing the services and rejecting TCPM's argument to the contrary. The Order Denying Rehearing of Bid Results mischaracterized TCPM's argument about non-compliance with the Tariff and avoided responding to TCPM's actual argument. TCPM had argued that the Tariff required ISO-NE to consider "the cost of providing the service," which would have represented a step in determining whether the price offered by each supplier was just and reasonable. To make that determination, ISO-NE would have had to determine how much of a total bid represented "costs" separate from a "competitive profit margin and risk premium." TCPM Request for Rehearing Docket No. ER13-1851 at 13-14 (JA __); TCPM Request for Rehearing Docket No. ER13-2266 at 9-10 (JA __). TCPM argued that neither ISO-NE nor FERC could make that determination because there was no evidence in the record that would enable FERC "to separate the cost of providing service from the amount of profit…" TCPM Request for Rehearing Docket No. ER13-1851 at 13-14 (JA __); TCPM Request for Rehearing Docket No. ER13-2266 at 9-10 (JA __). FERC's rejection of TCPM's argument was arbitrary and capricious and not supported by

16

substantial evidence because there was no evidence in the record to separate those two components of suppliers' offers.

FERC also acted arbitrarily and capriciously, failed to engage in reasoned decision-making, and abused its discretion by ordering ISO-NE to allocate Program costs to Real-Time Load Obligation (*i.e.*, load serving entities).

Understanding the consequences of allocating the costs of the Program to either Regional Network Load (*i.e.*, transmission owners), as ISO-NE proposed, or to Real-Time Load Obligation (paid by load serving entities), which FERC ordered, requires an understanding of the concepts underlying the ISO-NE market. Load is the demand for electric energy, and a load serving entity is defined as "an entity that secures electric energy, transmission service, and related services to serve the demand of its customers." A transmission owner is "an entity that owns and maintains transmission facilities." *See* ISO-NE Glossary and Acronyms, *available at* http://www.iso-ne.com/participate/support/glossary-acronyms (last accessed Nov. 19, 2014). Load serving entities enter into bilaterally negotiated contracts with their customers to provide energy, capacity and ancillary services to those customers at rates that do not change with regulatory changes or new reliability requirements that require additional services such as winter reliability services. Transmission owners, on the other hand, transmit the energy to the load and the costs of regulatory changes are passed through to the customers as those

17

benefiting from the regulatory change.  The compensation mechanisms for load

serving entities and transmission owners thus are very different. If costs associated

with a regulatory change requiring additional reliability services are allocated to

load serving entities, the load serving entities typically cannot recover those

additional costs under their previously negotiated contracts that could not have

foreseen the future additional reliability services and attendant costs.  If costs

associated with a regulatory change requiring additional reliability services are

allocated to transmission owners, the transmission owners can collect the

additional costs from the customers on a guaranteed basis under the FERC

approved rate, as discussed in Sections G and H, *infra*.

FERC violated FPA Section 205 and decades of judicial and FERC

precedent by failing to consider whether ISO-NE's proposal to allocate the

Program costs to transmission owners was just and reasonable and instead

substituting its own proposal to allocate costs to load serving entities.  Moreover,

the cost causation principles that FERC cites in support of its decision actually

support ISO-NE's proposal to allocate costs initially to transmission owners.  If the

Program costs are initially allocated to transmission owners, 100% of the costs will

ultimately be passed through to and borne by load, which is the market segment

which causes the costs to arise and which FERC identifies as benefitting from the

Program.  By allocating the costs to load serving entities, FERC assured that load

18

would ultimately not bear a significant portion of the Program costs because load serving entities' existing contracts with load likely would prevent load serving entities from passing through those costs to load in most instances. To properly apply cost causation principles, the Program's costs should have been allocated initially to transmission owners as that was the only way to ultimately align cost responsibility with cost causation. Further, FERC inappropriately relied on its Winter 2005-2006 Order to support its allocation methodology. The facts in that decision are distinguishable from the facts at issue here, as described *infra*.

Finally, FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, and abused its discretion by failing to consolidate Docket Nos. ER13-1851 and ER13-2266. Neither docket had enough information on both the Program and the resulting rates to enable FERC to make a reasoned determination on the reasonableness of either, and FERC created a situation where issues could be punted from one docket to the other without ever really being decided in a rational, transparent manner. If the proceedings are remanded to FERC for further decision, FERC should be required to determine whether the Program and its costs are just and reasonable on a conjunctive basis, not on a piecemeal basis where the Program and its costs are reviewed separate from each other. FERC should not once again be given the opportunity to claim issues in one

19

docket should be brought up in another docket when they are inextricably tied due to the cost-based nature of the service.

## STANDING

Any party aggrieved by a FERC order may seek judicial review.  16 U.S.C. § 825*l*(b).  A party is aggrieved if it can establish the "constitutional and prudential requirements for standing" under the FPA to challenge the underlying orders.  *See New York Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 586 (D.C. Cir. 2011) (citations omitted).  Constitutional standing requires (i) injury-in-fact; (ii) causation; and (iii) redressibility.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("*Lujan*") (citations omitted).  RESA and TCPM were both parties to the proceedings before FERC.  RESA's members and TCPM are load serving entities that are injured by FERC's orders because they are being allocated the costs of the Program, which is a direct result of FERC's acceptance of the Program and its rates, as well as its decision to allocate costs to Real-Time Load Obligation. A favorable decision in this case would provide redress for RESA and TCPM because it would vacate the Orders at issue, thus relieving RESA's members and TCPM from being subject to the unjust and unreasonable Program and rates, and from having to bear the costs associated with the Program.  RESA and TCPM thus have standing to bring this challenge to FERC's orders in the underlying dockets.

WAS:213833.8

## ARGUMENT

RESA only joins only in Sections F, G, and H of this Brief.

### A.    Standard of Review

Under the Administrative Procedure Act ("APA"), FERC's orders must be set aside if they are "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), 706(2)(D) (2012). An agency violates those requirements if it fails to articulate "'a rational connection between the facts found and the choice made,'" *Florida Gas Transmission Co. v. FERC*, 604 F.3d 636, 639 (D.C. Cir. 2010) (citation omitted); fails "to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); "ignores important arguments or evidence," *Natural Res. Def. Council v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987); or offers "an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *AT&T Corp. v. FCC*, 236 F.3d 729, 734 (D.C. Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29 (1983)). Under this standard of review, FERC also "must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record." *Pac. Gas & Elec. Co. v. FERC*, 306 F.3d 1112, 1115 (D.C. Cir. 2002)

21

(quoting *Sithe/Independence Power Partners, LP v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999)).

As demonstrated below, the Orders on review were arbitrary, capricious, an abuse of discretion, not supported by substantial evidence and do not constitute reasoned decision-making.  Accordingly, FERC's orders should be vacated and these matters remanded to FERC with directions to correct its orders consistent with this Court's ruling.

**B.    There Was No Evidence in the Record To Allow FERC to Determine Whether The Cost-Based Winter Reliability Program and Resulting Rates Were Just and Reasonable.**

FPA Section 205 requires that all rates and charges, and all rules and regulations pertaining to those rates, be just and reasonable.  16 U.S.C. § 824d(a).  FERC must reject a utility's rate "if it finds that the changes proposed by the public utility are not 'just and reasonable.'"  *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002) (citing 16 U.S.C. § 824d(e)).  In order for this Court to uphold a FERC finding that a rate is just and reasonable under FPA Section 205, FERC "must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record."  *Pac. Gas & Elec. Co.*, 306 F.3d at 1115 (quoting *Sithe/Independence Power Partners, LP v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999)).  "What is basic is the requirement that there be support in the public record for what [was] done."  *Am. Pub. Gas Ass'n v. FPC,* 567 F.2d 1016,

22

1029 (D.C. Cir. 1977); *City of Charlottesville v. FERC*, 661 F.2d 945, 950 (D.C. Cir. 1981) (stating that FERC must "specify the evidence on which it relied and [ ] explain how that evidence supports the conclusion reached.") (internal citation omitted). Administrative decisions must articulate their reasoning with clarity to allow the courts to determine whether the agency appropriately exercised the discretion given to it by Congress. *FPC v. Texaco*, 417 U.S. 380, 395-396 (1974).

Although FERC does have discretion in formulating its approach, the approach FERC uses must ensure that the rates are just and reasonable under FPA Section 205, and FERC must clearly describe its approach and the standard used to determine that a rate is just and reasonable. *Pac. Gas & Elec.*, 306 F.3d at 1119, 1121. This court has vacated a FERC order where FERC attempted to justify its approach by stating "[w]e believe that the approach we took properly balances our duty to ensure the justness and reasonableness of the ISO's rates with the fact that [the municipality] itself is not jurisdictional for purposes of FPA Section 205." *Id.* at 1118 (citation omitted). The court found that FERC's attempted justification failed to articulate a method or standard for ensuring that the proposed rate was just and reasonable. The court required that on remand, FERC must "articulate with clarity what approach and standard are governing its review and how both ensure the [proposed] rates are just and reasonable under § 205." *Id.* at 1119. In *City of Charlottesville v. FERC*, 661 F.2d 945, the court remanded a case where

23

FERC failed to adequately specify the evidence on which the orders were based. The court made that finding, in part, because the record was incomplete with regard to the relationship between certain types of costs included in rate base. *Id.* at 952. The court in *City of Charlottesville* also found that on another issue, the record was in conflict with FERC's assertion on the issue, and that the disparity made FERC's decision not based on substantial evidence. *Id.* at 954. Similarly, in *Washington Gas Light Co. v. FERC*, 532 F.3d 928, 932 (D.C. Cir. 2008), this court vacated a FERC finding that was not based on substantial evidence where FERC relied on one piece of evidence detailing actions in the past that were on a much smaller scale than those involved in the case and FERC did not respond to contentions regarding limitations it faced in resolving the immediate problem caused by FERC's orders. *Id.* at 932.

This precedent is applicable here, where FERC's orders were not based on substantial evidence because there was no evidence in the record of either underlying proceeding to enable FERC to determine that the Program and the proposed rates were just and reasonable. Additionally, FERC failed to adequately articulate and explain the standard or method it used to reach its determinations. *See, e.g.*, *Pac. Gas & Elec. Co.*, 306 F.3d 1112; *City of Charlottesville,* 661 F.2d 945; *Washington Gas Light Co.*, 532 F.3d 928. The only thing FERC stated with respect to whether the Program and/or rates were just and reasonable was "[t]he

24

Commission may consider a wide variety of factors in determining whether rates are just and reasonable under the FPA, and in this case, the Commission weighed prospective costs, as well as the need to ensure reliability during the then-imminent winter 2013-2014." Order Denying Rehearing of Bid Results at P 15 (JA __). However, there was no cost information in the record for FERC to weigh.

FERC has jurisdiction over the rates of public utilities under FPA Section 205. Here, the Program did not entail market-based rates, which FERC repeatedly acknowledged. Order Accepting Tariff Revisions at PP 33, 38, 42, 50, 54 (JA __); Order Denying Rehearing of Tariff Revisions at PP 19, 23, 26 (JA __). The Program is a cost-based program, and as such, FERC's regulations as well as the forgoing precedent required ISO-NE to submit evidence sufficient to support a finding that the cost discovery mechanism of the Program (*i.e.*, solicitation of offers from suppliers) and the resultant rates were just and reasonable. In particular, Section 35.13 of FERC's regulations requires public utilities to file cost and other information in order to support cost-of-service rates. 18 C.F.R. § 35.13 (2014). This Court has stated that it is "well established that electrical rates should be based on the costs of providing service to the utility's customers, plus a just and fair return on equity." *Pac. Gas & Elec. Co.*, 306 F.3d at 1120 (citation omitted). In furtherance of Section 35.13 of FERC's regulations and this court's precedent, FERC was required to review information related to the costs of providing the

25

services involved in the Program as well as information concerning the return on equity in order to determine whether the Program itself and the resulting rates were just and reasonable. The record, however, contains no evidence that allowed FERC to determine the costs of providing the service contemplated by the Program, the return on equity, risk, or overall rate of return. The Program instead used a solicitation process from suppliers, without cost support. Moreover, there was no showing that the market was competitive, *i.e.*, one in which there were a sufficient number of sellers such that market prices could not be influenced by the exercise of market power. As such, FERC's approval of the solicitation process did not put in place any policing mechanism to prohibit the exercise of market power.

The only financial information ISO-NE provided to FERC concerned the prices at which suppliers were willing to provide their services. Neither ISO-NE nor any other party submitted information about the suppliers' costs, or the profit margins or returns the suppliers built into their prices or information, for instance, on market concentration, the market shares of the bidding suppliers or barriers to entry. Although ISO-NE submitted no such information to FERC, the ISO-NE Tariff Filing itself suggested that the profit margins suppliers had built into their prices were excessive and unjust and unreasonable. Analysis Group, Inc. ("Analysis Group"), ISO-NE's own consultant, had estimated that the costs of the

Program would range from $16 to $43 million even before ISO-NE made its Emergency Amendment Filing to reduce risks to suppliers and therefore increase supply and reduce suppliers' costs. ISO-NE referenced the $16 to $43 million estimate in its Tariff Filing, although it did not provide the study supporting the estimate as evidence in either docket. ISO-NE Tariff Filing at 25 n.68; ISO-NE Tariff Filing, Joint Testimony of Ethier and Brandien at 29. Section C, *infra*, discusses how FERC erred by disregarding the significance of the Analysis Group estimate. The point here is that the Analysis Group's study was not part of the administrative record before FERC and there was no other evidence in the record of the costs of the cost-based services or Program. Similar to the factual situations in *Washington Gas Light Co. v. FERC*, *City of Charlottesville v. FERC*, and *Pacific Gas & Electric Co. v. FERC*, the absence of such evidence renders the Orders on review incompatible with the requirement of the FPA that substantial evidence be submitted to support the proposed cost-based rates as a predicate to FERC finding them to be just and reasonable.

The insufficiency of the evidence relied upon by FERC is also highlighted by the fact that FERC declined to consolidate the dockets below. In Docket No. ER13-1851, FERC considered the Program, and in Docket No. ER13-2266, FERC considered the bid results. The tariff filing regarding the Program in Docket No. ER13-1851 outlined the terms and conditions for the rates that were submitted and

27

accepted in Docket No. ER13-2266. In considering and approving the Program as just and reasonable in Docket No. ER13-1851, FERC had no evidence regarding the costs upon which a rate would be based. That evidence was to be submitted in Docket No. ER13-2266 although it was not submitted there either.

Similarly, in Docket No. ER13-2266, there was no evidence regarding the Program, other than: (i) ISO-NE's representation that "the bid sheets include the bidders' commitment to abide by the terms of Appendix K in ISO-NE's tariff and to perform in accordance with the information provided in the bid sheet," Results of Bidding Filing at 3 (JA __); and (ii) disclosure that insufficient supply was available to meet ISO-NE's requested service and steps were taken to reduce risks to try to increase supply at lower costs. A Request For Proposals with insufficient, non-transparent offers cannot be deemed to be competitive, nor can it be the basis for establishing cost-based rates. Essentially, ISO-NE submitted to FERC for approval a Program that would only obtain *prices* from suppliers (without cost break downs) for a very limited amount of supply versus the demand. "[O]nly the price and amount were submitted to FERC as the resulting 'rates, terms and conditions.'" Results of Bidding Filing at 3 (JA __). FERC's acceptance of the bid results, and implicitly, the Program itself, based solely on the results of the bidding process therefore was not based on substantial evidence because there was no evidence in the record of either proceeding to allow FERC to examine the

28

actual costs of the Program, as opposed to the prices offered, in order to determine whether the Program's rates were just and reasonable.

FERC failed to address these arguments in TCPM's requests for rehearing. It specifically did not address TCPM's argument that the record was devoid of evidence necessary to determine whether the cost-based Program was a reasonable design, and whether the resulting rates were just and reasonable. *See* TCPM Request for Rehearing Docket No. ER13-1851 at 12-14 (JA __); TCPM Request for Rehearing Docket No. ER13-2266 at 9-12 (JA __). This Court has found that FERC's failure to respond meaningfully to facially legitimate arguments demonstrates that a decision is not a product of reasoned decision-making. *See Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001); *see also Washington Gas Light Co.*, 532 F.3d at 932; *Pac. Gas & Elec.*, 306 F.3d at 1120-21. Thus, FERC's failure to respond to TCPM's arguments regarding the lack of evidence in the record concerning the Program's costs renders its orders arbitrary and capricious and not based on reasoned decision-making.

FERC also failed to articulate a standard or method for determining that the Program and rates were just and reasonable, which renders its decision arbitrary and capricious, and not based on substantial evidence. *See City of Charlottesville v. FERC*, 661 F.2d at 950; *FPC v. Texaco*, 417 U.S. at 395-396; *Pac. Gas & Elec.*, 306 F.3d at 1119, 1121. In the Order Denying Rehearing of Tariff Revisions,

29

FERC stated that it appropriately weighed competing factors, such as the need to ensure reliability and *prospective costs*, when it accepted the Program.  Order Denying Rehearing of Tariff Revisions at P 15 (JA __).  In the Order Denying Rehearing of Bid Results, FERC stated that challenges to the Program itself "will be addressed in [FERC's] order on rehearing in that case," and that FERC:

> balanced the actual costs reflected in the Bid Results with the need to make such expenditures to address pressing reliability risks. The balancing of cost with other critical considerations is in keeping with the FPA, under which FERC may consider a wide variety of factors in determining whether rates are just and reasonable.

Order Denying Rehearing of Bid Results at PP 15, 17 (citation omitted) (JA __).  These broad, sweeping statements are analogous to the arguments this Court rejected as a basis upon which to uphold FERC's orders in *Pacific Gas & Electric Co. v. FERC*.  306 F.3d at 1118  ("We believe that the approach we took properly balances our duty to ensure the justness and reasonableness of the ISO's rates with the fact that [the municipality] itself is not jurisdictional for purposes of FPA Section 205.").  FERC's conclusory assertions here similarly provide no clear standard for determining whether the Program's rates are just and reasonable under FPA Section 205 because no cost-based evidence exists in the record.

Furthermore, the case FERC relies on, *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581 (1945) ("*CIG*"), to support its statement that under the FPA "FERC may consider a wide variety of factors in determining whether rates are just and

30

reasonable," Order Denying Rehearing of Bid Results at P 15 (JA __), does not support that contention.  The portion of *CIG* that FERC relies on discusses a FERC-approved allocation method for segregating FERC-regulated costs from non-FERC regulated costs.  The court approved the allocation method because Congress did not explicitly state in the Natural Gas Act how those costs should be allocated, and FERC offered a reasoned approach.  *CIG*, 324 U.S. at 589.  The Court stated that allocation of regulated versus non-regulated costs in jurisdictional rates "involves judgment on a myriad of facts" and the Court discussed the rationale that FERC applied in making its allocation decision.  *Id.*  This analysis is inapplicable to FERC's statement in its Order Denying Rehearing of Bid Results because FERC did not articulate any standard upon which it determined that the Program and rates were just and reasonable; rather, FERC simply stated that it "balanced the actual costs reflected in the Bid Results with the need to make such expenditures to address pressing reliability risks" without articulating with clarity how it determined that the Program and rates were *cost-based* and just and reasonable.  Order Denying Rehearing of Bid Results at P 15 (JA __).  Moreover, FERC did not and could not have balanced actual costs against anything because FERC did not have evidence of actual costs before it.  FERC only had evidence of the suppliers' offers without any evidence of the suppliers' costs.  FERC's

31

sweeping assertion about balancing concerns is empty because it did not have evidence to balance.

This court stated in *CIG* that judicial review of FERC decisions is intended to keep "the Commission within the bounds which Congress created."  324 U.S. at 589.  FPA Section 205 requires FERC to determine that rates are just and reasonable, and the APA requires FERC to make such decisions based on substantial evidence and pursuant to a clearly articulated standard.  *Pac. Gas & Elec.*, 306 F.3d at 1119, 1121.  Substantial evidence did not exist in these dockets and FERC provided no clearly articulated standard under which it approved the Program and its rates.   FERC's orders thus should be vacated.

> **C.    FERC Erred In Rejecting TCPM's Argument That the Large Disparity Between the Estimated and Actual Costs of the Program and Suppliers' Bids Demonstrated That The Program Was Flawed, Not Just and Reasonable, and Did Not Produce Just And Reasonable Rates.**

As discussed above, in its application seeking approval of the Program, ISO-NE stated that its consultant, the Analysis Group, "produced an analysis of the costs of providing the Program services, concluding that the costs range from $16 to $43 million."  ISO-NE Tariff Filing at 25 n.68 (JA __).  Parties challenged those cost estimates.  *See, e.g.*, *ISO New England, Inc.*, Notice of Intervention and Protest of the Maine Public Utilities Commission, Docket No. ER13-1851 at 9 (filed July 19, 2013) (JA __); *ISO New England, Inc.*, Motion to Intervene and

Comments of the New England States Committee on Electricity, Docket No. ER13-2266 at 6 (filed Sept. 9, 2013) (JA __); *ISO New England, Inc.*, Motion to Intervene, Comments and Request to Consolidate Proceedings of TransCanada Power Marketing Ltd., Docket No. ER13-2666 at 5 (filed Sept. 9, 2013) (JA __). Thereafter**,** ISO-NE asserted that the Analysis Group estimate only referred to the amount suppliers would incur in providing the service, and that risk premiums and profit margins would be added to the estimated cost in final bids.  *See ISO New England*, *Inc.*, ISO-NE Answer to Protest and Comments, Docket No. ER13-1851 at 8 (filed Aug. 6, 2013) (ISO-NE "has stated that it expects bids to be based on the costs estimated by the Analysis Group, plus a competitive profit margin and risk premium.") (JA __); *ISO New England, Inc.*, Motion for Leave to Answer and Answer of ISO-NE, Docket No. ER13-2266 at 3(filed Sept. 12, 2013) ("As the cost estimate was merely an indication of costs to participants of providing the Winter Reliability Program services, [ISO-NE] expected that participants' bids would reflect the addition of risk premiums and profit margins - neither of which could be easily predicted - to the estimated costs.") (JA __).  Ultimately in Docket No. ER13-2266, ISO-NE disclosed that suppliers had bid a total of $78.8 million to provide 83% of the service ISO-NE had estimated would cost $16 to $43 million. Results of Bidding Filing at 3 (JA __).

33

Assuming ISO-NE's original cost estimate was a reasonably accurate estimate of suppliers' costs (notwithstanding that evidence of such is not in the record), ISO-NE's own statements suggest that the $35.8 to $62.8 million price of the Program above the range of costs Analysis Group had estimated was attributable to profit margins and risk premiums. Additionally, because the cost estimate was based on the equivalent of 2.4 million MWh, the bid results for just 1.995 million MWh, Results of Bidding Filing at 3 (JA __), suggest that suppliers included in their bids profit margins and risk premiums equal to, or even greater than 100% of their actual costs. These profit margins and risk premiums were added by suppliers as part of their bids, and there was no information supplied to ISO-NE or evidence submitted to FERC to determine what part of each bid was made up of actual costs incurred by the supplier to provide the service, and what part each supplier included in its bid for a profit margin and risk premium.

Given the evidence that suggested suppliers had included profit margins/risk premiums of potentially more than 100% of their cost, TCPM argued that FERC's orders approving the Program and the bid results did not reflect reasoned decision making and that the costs of the Program likely were unjust and unreasonable. TCPM Request for Rehearing Docket No. ER13-1851 at 12-18 (JA __). TCPM's argument reflected a truism -- without proper evidence, it is impossible to justify a conclusion that the resulting offers were just and reasonable.

34

FERC however declined to examine whether the disparity between the cost estimate and the bid results rendered the cost of the Program unjust and unreasonable and did not seek cost information separate from the supply offers. FERC ruled that "the fact that the Program resulted in an actual cost higher than the estimate does not alone demonstrate that the Program is unjust and unreasonable," Order Denying Rehearing of Tariff Revisions at P 21 (JA __), and "we are unpersuaded . . . that the disparity indicates that market participants included 'excessive profit margins' in their bids. [TCPM's] argument is speculative and not based on any evidence in this proceeding", Order Denying Rehearing of Bid Results at P 15 (JA __).

FERC's failure to examine this disparity, to seek additional information regarding the cost of providing the service, and to determine whether profits were excessive renders FERC's findings arbitrary, capricious, not based on substantial evidence and not based on reasoned decision-making.

FERC's ruling also disregards burden of proof requirements and basic logic. ISO-NE bore the burden of proof to provide evidence to demonstrate that costs of the Program and the resulting "cost-based" rates were just and reasonable. 16 U.S.C. § 824d. TCPM did not have that burden. The fact that TCPM's argument was not based on evidence ironically corroborates the correctness of the argument, *i.e.*, because ISO-NE had not provided evidence, the record was devoid of

35

evidence to compare the Analysis Group's cost estimate against suppliers' actual costs. FERC's rejection of TCPM's argument improperly shifted the burden of proof to TCPM to prove as an initial matter that the Program's costs and rates were unjust and unreasonable.

Further, while TCPM's argument may not have been based on evidence in the record, the same is true for the Commission's determination. The lack of any evidence supporting just and reasonable rates is significantly more problematic considering that the FPA requires evidence, and the anecdotal evidence represented by the disparity between the estimate of the Program's costs and the prices bid suggests that rates were not just and reasonable.

Additionally, FERC's statement that it was not persuaded by TCPM's "assertion that the disparity indicates that market participants included 'excessive profit margins' in their bids" Order Denying Rehearing of Bid Results at P 15 (JA __), is contradicted by the anecdotal evidence that actually exists in the record, as described above. ISO-NE's cost estimate was $16 - $43 million without profit or risk premiums and the supply offers totaled $78.8 million – well in excess of the high end of ISO-NE's estimated cost. There is absolutely nothing in the record related to the cost assumptions included in ISO-NE's cost estimate or the cost of service associated with the supply offers. Nevertheless, in light of ISO-NE's statements related to its cost estimate excluding risk premiums and profits and the

36

expectation that actual offers would be higher by such amounts, it was arbitrary and capricious, a failure to engage in reasoned decision-making, and a failure to base its decisions on substantial evidence for FERC to suggest that TCPM's assertion that supply offers nearly double the high end of ISO-NE's estimate was not persuasive to question the reasonableness of rates and for FERC to blindly accept the supply offers as reasonable without any cost basis. Given the evidence of the disparity between the estimate and the bid results, at a minimum, FERC had an obligation to seek and establish a factual record to determine whether the supply offers of this cost-based program were just and reasonable.  It acted beyond its statutory authority in approving the cost of the Program without examining evidence to make that determination.

> **D.     FERC Acted Arbitrarily and Capriciously, Failed to Engage in Reasoned Decision-making and Abused Its Discretion In Finding That ISO-NE Complied With The Tariff Requirement To Consider The "Cost (dollars/MWh) of providing the oil storage and demand response services."**

In its Request for Rehearing of the Order Approving Bid Results, TCPM argued that "ISO-NE failed to comply with its own criteria in choosing bids." TCPM Request for Rehearing Docket No. ER13-2266 at 12 (JA __).  To support that argument, TCPM quoted Appendix K, section III.K.6 of ISO-NE's tariff, which states in relevant part: "In making its selections, the ISO shall consider relevant factors, including: (a) Cost (dollars/MWh) of providing the oil storage and

demand response services . . ." TCPM then argued that: "[t]his criterion, on its face, suggests that the *cost, or the amount it would cost participants to procure the oil* to be used in the oil inventory service, would be taken into account by ISO-NE when it chose which bids to accept." *Id.* at 12 (emphasis added in part) (JA __). That sentence was only part of TCPM's broader argument that FERC erred in failing to determine "whether the Program was structured in such a way as to produce just and reasonable rates." *Id.* at 8 (JA __). In support of the broader argument, TCPM asserted more broadly that notwithstanding section III.K.6 of Appendix K of ISO-NE's Tariff:

> the Commission did not have any information that would enable it *to separate the costs of providing the service* from the amount of profit providers would be making based upon the bids they submitted to participate in the Program. The bid price – not costs – is what ISO-NE used to set this cost-based rate. Furthermore, the criteria and discretion ISO-NE provided itself, *i.e.*, "the assessment of the winning bids will not consider price alone," opened the door for bidders to incorporate high profit margins into their bids because of the uncontestability of the process. The unchecked potential for bids in a cost-based program to include excessive profits that are unrelated to actual risks and costs incurred by providers results in a circumstance in which the Commission leaves unanswered whether the rates are just and reasonable. In the context of a cost-based program, the Commission thus failed to carry out its statutory duty to make that determination.

TCPM Request for Rehearing Docket No. ER13-2266 at 9-10 (quoting ISO-NE

Tariff Filing at 7) (emphasis added) (internal citation omitted) (JA __).

Rather than address this broader argument, FERC plucked from it the phrase

"*the amount it would cost participants to procure the oil*," to suggest that TCPM's

sole argument concerning section III.K.6 of Appendix K of ISO-NE's Tariff was

limited to a contention that ISO-NE was required to determine that specific cost of

procurement of oil independent of determining the total cost of providing the

service.  S*ee* Order Denying Rehearing of Bid Results at P 14 (JA __).   FERC

stated:

> [w]hile section III.K.6(a) allows ISO-NE to consider both
> price and non-price factors in selecting the winning bids,
> the Tariff does not, contrary to TransCanada's assertion,
> require ISO-NE to consider "the amount it would cost
> participants to *procure* the oil," as TransCanada alleges.
> Rather, it requires ISO-NE to consider the overall cost of
> *providing* the services.  The Tariff states, in relevant part,
> "[i]n making its selections, the ISO shall consider
> relevant factors, including: (a) Cost (dollars/MWh) of
> providing the oil storage and demand response services . .
> ."   There is a distinction between the cost of procuring
> fuel and the cost of providing a fuel service.

Order Denying Rehearing of Bid Results at P 14 (emphasis in original) (JA __).

Based upon that mischaracterization and limitation of TCPM's argument, FERC

ruled that "ISO-NE reasonably followed its Tariff in interpreting the provision to

39

mean it was required to consider the cost of providing services when selecting the winning bids." Order Denying Rehearing of Bid Results at P 14 (JA __).

In fact, TCPM's argument was not limited to arguing that "the Tariff . . . require[d] ISO-NE to consider 'the amount it would cost participants to procure the oil' " as FERC asserted. TCPM's actual argument was as shown at page 38, *supra*, that FERC needed to determine "the costs of providing the service," but that FERC lacked information, as did ISO-NE, "*to separate the costs of providing the service [however they arose] from the amount of profit providers would be making based upon the bids they submitted . . .*" TCPM Request for Rehearing Docket No. ER13-2266 at 9 (emphasis added) (JA __). By mischaracterizing and limiting the scope of TCPM's argument, FERC avoided responding to TCPM's broader argument, and there is no record support for FERC's conclusion that ISO-NE complied with its tariff because there is nothing in the record related to actual costs.

Section III.K.6 of Appendix K of ISO-NE's Tariff clearly required, as FERC and TCPM agree, ISO-NE to determine the "Cost (dollars/MWh) of providing the oil storage and demand response services." In order to determine the costs, whether they be the cost of procurement only, or the total cost of providing service (which FERC and TCPM also agree was necessary), ISO-NE had to have information about what profit and risk premium was built into each supplier's bid.

40

It is undisputed that neither ISO-NE nor FERC had that information. Accordingly, as TCPM argued, "[t]here was no information as to the costs that each provider would incur to provide service." TCPM Request for Rehearing Docket No. ER13-2266 at 10 (JA __). The absence of that information shows that FERC erred in ruling that ISO-NE reasonably interpreted and complied with its Tariff which required ISO-NE to determine the "Cost (dollars/MWh) of providing the oil storage and demand response services."

> **E.** **FERC Acted Arbitrarily and Capriciously, Failed to Engage in Reasoned Decision-making and Abused Its Discretion in Failing to Address TCPM's Argument that FERC Should Have Determined Suppliers' Profit Margins and Risk Premiums Through Cost-Based Ratemaking, and That Its Failure to Do So Here Was Unreasonable.**

In its Order Accepting Bid Results, FERC in effect summarily dismissed arguments TCPM and others raised concerning the disparity between the estimated cost of the Program and the Program's price based on the bid results. It did so by ruling that the Program "does not easily lend itself to precise cost predictions." Order Accepting Bid Results at P 25 (JA __). TCPM sought rehearing of that ruling, arguing that FERC is not excused from performing its statutory responsibilities, including the duty to respond to facially legitimate objections, merely because it is not easy to estimate costs of a new program. TCPM Request for Rehearing Docket No. ER13-2266 at 15-16 (JA __). TCPM also argued that FERC is able to determine profit margins and risk premiums through typical cost-

41

of-service ratemaking mechanisms that FERC regularly uses in performance of its statutory duties and that FERC should have made those determinations here since the oil inventory service component of the Program is supposed to be cost-based. *Id.* at 16 (JA __).  FERC did not address this argument in its rehearing order.

Rather than address the argument head on, in its Order Denying Rehearing of Bid Results, FERC avoided the argument stating that the Program "involved a novel approach to addressing reliability concerns, the costs of which could not be easily identified with certainty."  Order Denying Rehearing of Bid Results at P 15 (JA __).

As noted above, it is "well established that electrical rates should be based on the costs of providing service to the utility's customers, plus a just and fair return on equity."  *Pac. Gas & Elec. Co.*, 306 F.3d at 1120 (internal citation omitted).  The inventory service provided under the Program has an underlying cost (although FERC never determined what that cost was) to which "a just and fair return on equity"  should be added.  FERC's decision not to undertake that analysis is confusing at best, and in contradiction of its statutory obligation given its decades of experience in determining returns to authorize in connection with cost-based rates.  If FERC had a rationale for declining to determine costs and returns here, beyond its assertion that it was difficult to do so, it had an obligation to explain the basis for its position.  It could not simply avoid the issue as it did.

42

FERC's failure to address this facially rational argument renders its decision arbitrary and capricious and not based on reasoned decision-making. *See Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001). Its failure to address this argument also represents a fundamental failure in FERC's use of its ratemaking authority.

### F. FERC Acted Arbitrarily and Capriciously, Failed to Engage in Reasoned Decision-Making and Abused Its Discretion in Failing to Determine Whether ISO-NE Had Met its Burden of Proof under FPA Section 205 to Show That the Program Costs Should be Allocated to Transmission Owners.

Under FPA Section 205, a utility may propose changes to its rates and conditions of services. *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002). The utility bears the burden of demonstrating that its proposed changes are just and reasonable. *See, e.g.*, *Maine Pub. Utilities Comm'n v. FERC*, 454 F.3d 278, 283 (D.C. Cir. 2006). However, when assessing the utility's proposal, FERC plays "'an essentially passive and reactive' role" such that the utility's proposal may only be rejected if FERC "finds that the changes proposed by the public utility are not 'just and reasonable.'" *Atl. City Elec. Co.*, 295 F.3d at 9-10. So long as the proposal by the utility is just and reasonable, the proposal must be accepted, even if there are other just and reasonable methodologies that could have been accepted. *City of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) (explaining that FERC is only to determine whether the rates proposed by the utility are just and

43

reasonable, not whether "a proposed rate schedule is more or less reasonable than alternative rate designs."). The proposal by the filing entity "need not be the only reasonable methodology, or even the most accurate." *OXY USA, Inc. v. FERC*, 64 F.3d 679, 692 (D.C. Cir. 1995). Therefore, before FERC may consider alternatives to the utility's proposal, it must first find that the utility's proposal is unjust and unreasonable.

In its June 28, 2013 application, ISO-NE proposed to allocate the Program costs to transmission owners, rather than to load serving entities. ISO-NE Tariff Filing at 25-26 (JA __); ISO-NE Tariff Filing, Joint Testimony of Ethier and Brandien at 29-31 (JA __). Thus, under ISO-NE's proposal, transmission owners would have borne *initial* responsibility for the costs of the program. ISO-NE Tariff Filing at 25 (JA __); ISO-NE Tariff Filing, Joint Testimony of Ethier and Brandien at 30 (JA __). ISO-NE explained that the Program's costs "are most appropriately allocated to [transmission owners] as an out-of-market, discrete program to address reliability concerns." ISO-NE Tariff Filing at 25 (JA __).

ISO-NE also discussed its reasons for proposing to allocate the Program's costs to transmission owners rather than load serving entities. It explained that FERC previously had "noted that it is appropriate for [ISO-NE] to consider the notice given to load serving entities and the assumptions they made in negotiating their long-term contracts" when considering to which entities to allocate costs.

44

ISO-NE Tariff Filing at 25 n.69 (citing *ISO New England Inc.*, 136 FERC ¶ 61,221

at 8 (2009)) (JA __).  ISO-NE explained that load serving entities typically would

not be able to obtain additional compensation from their customers to cover the

Program's costs.  ISO-NE Tariff Filing, Joint Testimony of Ethier and Brandien at

30 (JA __).

> It would have been difficult, if not impossible, for the suppliers
> to anticipate these additional costs, as the need for the program
> only became evident after events in January and February,
> following which the project was initiated in March for
> implementation in December.  Thus, it would have been very
> difficult for suppliers to build the costs of this out-of market
> program into their contracts for the upcoming winter.
> Moreover, if these difficult-to anticipate costs are allocated to
> Real-Time Load Obligation, suppliers may seek to build
> increased risk premiums into future contracts to cover future
> unanticipated programs of this type. These risk premiums will
> lead to higher consumer costs for a number of years.

ISO-NE Tariff Filing, Joint Testimony of Ethier and Brandien at 30 (JA __); *see*

*also* ISO-NE Tariff Filing at 25 (JA __).  Since the circumstances of the allocation

of the Program costs were "unique - including the lack of notice and the out-of-

market nature of the solution," ISO-NE concluded that the program costs were

more appropriately allocated initially to transmission owners on a short term basis

because transmission "owners have the legal right to pass through these costs on a

one-time basis."  ISO-NE Tariff Filing at 25-26 (JA __).  ISO-NE's conclusion is

supported by long-standing Supreme Court precedent.  *Nantahala Power & Light*

*Co. v. Thornburg*, 476 U.S. 953 (1986) ("*Nantahala*"); *see also Narragansett*

45

*Electric Co. v. Burke*, 381 A. 2d 1358 (R.I. 1977), *cert. denied*, 435 U.S. 972 (1978) ("*Narragansett*").

In disregard of the precedent discussed above concerning FERC's role in evaluating proposals under FPA Section 205, in the Order Accepting Tariff Revisions, FERC did not evaluate whether ISO-NE's short term proposal was just and reasonable.  Instead, FERC substituted its own proposal to allocate the costs to load serving entities rather than transmission owners.  Order Accepting Tariff Revisions at P 70 (JA __).  In support of its conclusion, FERC relied upon its own analysis of "cost-causation and benefits/burdens principles" in an order issued nine years ago in other circumstances, *i.e.*, the Winter 2005-2006 Order.  Order Accepting Tariff Revisions at PP 70-72 (citing Winter 2005-2006 Order, 113 FERC ¶ 61,220 at P 34, *order on reh'g*, 115 FERC ¶ 61,145) (JA __).  FERC did not address the issue required by FPA Section 205: whether ISO-NE's proposal to initially allocate the Program costs to transmission owners for a discrete period of time was just and reasonable considering transmission owners could pass the cost on to load who are the beneficiaries of the reliability service.  *See* Order Accepting Tariff Revisions at PP 70-76 (JA __).

Petitioners each sought rehearing regarding FERC's ruling concerning the allocation of costs.  TCPM Request for Rehearing Docket No. ER13-1851 at 5, 10-11, 18-21 (JA __); RESA Request for Rehearing Docket No. ER13-1851 at 5-13

46

(JA __).  On rehearing, FERC made contradictory statements that failed to consider whether ISO-NE's proposal to allocate the costs to transmission owners was just and reasonable.  FERC claimed that it "cannot find that the costs should be allocated to transmission customers because, although the Program indirectly enhances transmission system reliability, there is no *direct* benefit to Regional Network Load [*i.e.*, transmission owners]."  Order Denying Rehearing of Tariff Revisions at P 24 (citing Winter 2005-2006 Order, 113 FERC ¶ 61,220 at P 34) (emphasis in original) (JA __).  Yet, in the next paragraph, FERC conceded that while it primarily considers cost causation principles, they need not be the sole determinative factor of whether ISO-NE's proposal was just and reasonable: "[FERC] may consider several factors in determining whether a proposal satisfies the requirements of the FPA . . ."  Order Denying Rehearing of Tariff Revisions at P 25 (JA __).  But rather than consider other factors, FERC stated that ISO-NE's arguments regarding the timing of the program had "no bearing upon the appropriate application of cost causation principles here."  Order Accepting Tariff Revisions at P 75 (JA __).  Accordingly, FERC's failure to consider whether ISO-NE's short term allocation proposal was just and reasonable was an abuse of discretion under *Atlantic City Elec. Co., City of Bethany,* and *Oxy USA.*

> **G.     FERC Acted in Contravention of Cost Causation/Cost Responsibility Principles When it Allocated the Costs of the Program to Load Serving Entities.**

FERC also violated "cost causation and benefits/burdens principles" *i.e.*, "costs should be allocated to those who benefit from the incurrence of the costs," in allocating the Program's costs to load serving entities rather than transmission owners.  Order Accepting Tariff Revisions at P 70 (citation omitted) (JA ___).

As discussed above, ISO-NE presented evidence that load serving entities would not be able to pass the costs of the Program on to their customers (load) who are the beneficiaries of the Program and reliability service.  ISO-NE Tariff Filing, Joint Testimony of Ethier and Brandien at 30 (JA __); s*ee* ISO-NE Tariff Filing at 25.  As a result, under FERC's allocation methodology, the Program costs will not be borne by load, but by load serving entities.  In contrast, under ISO-NE's allocation proposal, the Program costs would have been allocated initially to transmission owners, but would have ultimately passed through to load.

According to FERC, cost-causation and benefits/burdens principles dictate that "costs should be allocated to those who benefit from the incurrence of the costs."  Order Accepting Tariff Revisions at P 70 (citation omitted) (JA __); Order Denying Rehearing of Tariff Revisions at P 24 (citation omitted) (JA __).  FERC stated that the goal of the Program was to "to improve reliability by ensuring that adequate electric energy supply is available to meet real-time load during the winter."  Order Accepting Tariff Revisions at P 72 (JA __).  FERC explained that ISO-NE's proposed Program is a "time-limited, out-of-market mechanism[]" that

48

is "appropriately considered [a] reliability measure[] directly benefitting real-time load [*i.e.*, "load"]"  Order Accepting Tariff Revisions at P 72 (citation omitted) (JA __); Order Denying Rehearing of Tariff Revisions at P 26  (JA __).  Based upon those conclusions, FERC found that "allocating costs to [load serving entities] is appropriate in this case."  Order Accepting Tariff Revisions at P 70 (JA __); Order Denying Rehearing of Tariff Revisions at P 26 (JA __).

FERC's reasoning was faulty because FERC failed to consider the record evidence that showed that load only would bear the costs of the Program if the costs initially were allocated to transmission owners.  FERC also disregarded the evidence that showed that load serving entities likely would have no opportunity to recover the full costs of the Program from load due to the fact that they could not pass through the Program's cost under their previously negotiated contracts with local distribution companies and end users.  ISO-NE Tariff Filing, Joint Testimony of Ethier and Brandien at 30 (JA __).  By disregarding this evidence, FERC misapplied the principle that cost responsibility follows cost causation.  By allocating the Program costs to load serving entities, FERC assured that load (the market segment that causes the costs to arise and benefits from the service) would avoid some if not all of the Program costs.  Instead, the Program costs will be borne by load serving entities, which did not cause the costs to arise, did not have a choice to procure reliability services, and do not benefit from the Program.

49

ISO-NE's proposal to allocate Program costs to transmission owners, on the other hand, would have resulted in 100% of the Program costs being borne by load. While transmission owners would have borne initial responsibility for the costs of the program, they would have been guaranteed the right to pass those costs through to ratepayers.   That result occurs because under *Nantahala* and *Narragansett*, subject to exceptions not relevant here, transmission owners cannot be prohibited from passing through all costs FERC finds to be just and reasonable.  *See Nantahala*, 76 U.S. 953; *Narragansett*, 381 A.2d 1358.  As a result, if the Program costs are allocated to transmission owners, 100% of the costs would be passed through to and borne by load, which is the market segment FERC identifies as having caused the costs to arise and as being the beneficiary of the Program.  Order Accepting Tariff Revisions at P 70 (JA __).  By allocating the costs to load serving entities, FERC violated the cost causation/cost responsibility principles it purported to apply.

## H.    FERC Acted Arbitrarily and Capriciously, Failed to Engage in Reasoned Decision-Making and Abused Its Discretion by Dismissing the Significant Impact on Consumers That Will Occur by Allocating the Program Costs to Real-Time Load Obligation.

FERC also acted arbitrarily and capriciously, failed to engage in reasoned decision-making and abused its discretion by dismissing evidence that allocating the Program costs to load serving entities would detrimentally impact consumers in the long run.  In its tariff filing, ISO-NE proposed allocating Program costs to

50

transmission owners because, *inter alia*, allocating the costs to load serving entities would result in long-term higher customer costs due to increased risks to load serving entities.  ISO-NE Tariff Filing at 25-26 (JA __);  ISO-NE Tariff Filing, Joint Testimony of Ethier and Brandien at 30-31 (JA __).  ISO-NE's testimony stated that if the Program costs "are allocated to Real-Time Load Obligation, suppliers may seek to build increased risk premiums into future contracts to cover future unanticipated programs of this type. These risk premiums will lead to higher consumer costs for a number of years."  ISO-NE Tariff Filing, Joint Testimony of Ethier and Brandien at 31 (JA __).  As TCPM and others showed, because load serving entities have no guarantee of rate recovery, they would need to include the cost of significant risk premiums in their future contracts to cover the potential for future similar unanticipated costs.  The effect of that would be to raise rates to ratepayers over an extended period or potentially eliminate certain load serving entities from the competitive market.

TCPM argued that the business environment in which load serving entities operate is highly competitive and margins are very small, and power prices are subject to significant swings in both directions.  *ISO New England Inc.*, Motion For Leave to Answer and Limited Answer of TransCanada Power Marketing Ltd., Docket No. ER13-1851 at 5-6 (filed Aug. 1, 2013) (JA __).  Therefore, load serving entities have to protect themselves by carefully hedging their exposure to

51

market prices.  Without doing so, no load serving entity can remain as an ongoing

viable entity for very long.  TCPM showed that given the significant range in the

potential costs of the Program, estimated by ISO-NE's consultant the Analysis

Group to be in a range of $16 to $43 million, ISO-NE Tariff Filing, Joint

Testimony of Ethier and Brandien at 29 (JA __), and the inability to pass costs

through to customers, there is no viable hedging product available to insulate load

serving entities from the potential negative consequences of bearing the costs of

the Program or future similar programs that require the purchase of a new

reliability product.  *ISO New England Inc.*, Motion For Leave to Answer and

Limited Answer of TransCanada Power Marketing Ltd., Docket No. ER13-1851 at

5-6 (filed Aug. 1, 2013) (JA __).   As a result, one way a load serving entity could

protect itself would be to include a significant risk premium in its sales price,

which would produce an inefficient and costly result for ratepayers.  *Id.* at 6 (JA

__).  An alternative would be to withdraw from the business of serving load on a

competitive basis, thereby reducing competition, which also harms consumers by

limiting provider and pricing options.

When discussing the ISO-NE's allocation proposal, FERC stated that it had

"rejected this argument in the past, and for the same reasons we do so here."  Order

Accepting Tariff Revisions at P 76 (citing Winter 2005-2006 Order, 113 FERC ¶

61,220 at P 35) (JA __).  FERC did not provide any further analysis in either the

52

Order Accepting Tariff Revisions or the Order Denying Rehearing of Tariff Revisions, and FERC did not cite to any evidence to support its determination that the two cases warranted the same treatment.

FERC's conclusory statement demonstrates that FERC did not actually consider the differences between the situation in its prior decision and the unique circumstances presented under ISO-NE's proposal. FERC simply relied on a past decision without consideration of the present circumstances and how they differed from the prior case.

FERC therefore erred in failing to consider the record before it, and thus its decision was arbitrary and capricious and not based on substantial evidence. *See Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001) ("Unless [FERC] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned.")

Further, the Winter 2005-2006 Order does not support FERC's position. In the Winter 2005-2006 Order, FERC found these arguments unpersuasive because they cut against ISO-NE's proposal "to allocate the posturing costs described in the Winter Package to [load serving entities]" which FERC found was just and reasonable. Winter 2005-2006 Order, 113 FERC ¶ 61,220 at P 35 (2005). Here, ISO-NE's proposal is the opposite: it advocated that the costs should be allocated to transmission owners, and FERC's obligation was to determine whether that

53

proposal is just and reasonable. Further, the Winter 2005/2006 Order was based on the facts and circumstances of a proceeding approximately ten years ago for a separate reliability proposal. FERC ignored the evidence in the record of this proceeding regarding the inability of load serving entities to pass through costs, the potential for cost increases, and the long-term impact on consumers. By relying on an order issued years ago under different circumstances, FERC failed to base its decision on substantial evidence. FERC's decision was arbitrary and capricious and FERC failed to engage in reasoned decision making.

I.     **FERC Acted Arbitrarily and Capriciously, Failed to Engage in Reasoned Decision-Making and Abused Its Discretion in Failing to Consolidate the Proceedings in Docket Nos. ER13-1851 and ER13-2266.**

Consolidation of matters is appropriate where there are common issues of law and fact, and consolidation will ultimately result in greater efficiency. *S. Carolina Elec. & Gas Co.*, 132 FERC ¶ 61,043 at P 23 (2010) (consolidating two dockets involving the same component to a utilities proposed formula rate) (citation omitted); *see Empire District Elec. Co.*, 133 FERC ¶ 61,004 at P 15 (2010) ("The Commission practice is to consolidate proceedings where the issues are closely intertwined with each other.") (consolidating two proceedings involving a proposed pro forma tariff and service agreements under the proposed tariff).

54

The dockets at issue here involved the same questions of fact and law: the appropriateness of the Program and the rates that would be charged under the Program. The Commission established a process in which, information to be received in one docket was necessary for an adequate understanding of the proposal in the other, as noted in Section B, *supra*. Further, the parties to the proceedings and FERC cross-referenced documents from both proceedings when discussing the issues presented. For example, ISO-NE's September 12, 2013 Answer in Docket No. ER13-2266 cited the ISO-NE's Answer and testimony in Docket No. ER13-1851. In the Order Accepting Bid Results in Docket No. ER13-2266, FERC cited to the ISO-NE Tariff Filing and ISO-NE's August 6, 2013 Answer in Docket ER13-1851. Order Accepting Bid Results at PP 25, 28 (JA __). Additionally, the Order Accepting Bid Results and the Results of Bidding Filing cannot be understood without a detailed examination of the record and Order Accepting Tariff Revisions in Docket No. ER13-1851. By consolidating the dockets, FERC would have avoided receiving duplicative information regarding the proposed tariff and avoided incorrectly deciding issues by blinding itself to information in one docket that is intrinsically intertwined with information in another docket.

Petitioners recognize the substantial precedent that holds that administrative agencies, including FERC, control their own dockets. *See Florida Mun. Power*

55

*Agency v. FERC*, 315 F.3d 362, 366 (D.C. Cir. 2003) (citation omitted).  However, where the determination of whether the Program was just and reasonable is intrinsically intertwined with determinations of how the rates are designed and whether the rates are just and reasonable, it was impossible for FERC to issue a reasoned decision in considering these issues separate and apart from each other. Therefore, if this case is remanded to FERC, TCPM requests that the Court order FERC to consolidate Docket Nos. ER13-1851 and ER13-2266 and/or consider the evidence in both dockets conjunctively rather than in isolation.

## CONCLUSION

For the foregoing reasons, TCPM respectfully requests that the Court vacate FERC's orders and remand these proceedings to FERC with directions to correct its orders consistent with the arguments outlined in this brief.

56

James D'Andrea
TransCanada USA Services Inc.
110 Turnpike Road
Suite 300
Westborough, MA 01581
Tel: (508) 475-6088
Fax: (508) 898-0433
E-mail: jim_dandrea@transcanada.com

Respectfully submitted,

*/s/ Kenneth Wiseman*
Kenneth Wiseman
Mark Sundback
Allison Hellreich
William Rappolt
Andrews Kurth LLP
1350 I Street, NW, Suite 1100
Washington, DC 20005
Tel: (202) 662-2700
Fax: (202) 662-2739
E-mail:  kwiseman@andrewskurth.com
        msundback@andrewskurth.com
        ahellreich@andrewskurth.com
        wrappolt@andrewskurth.com

ATTORNEYS FOR TRANSCANADA POWER MARKETING LTD.

Elizabeth W. Whittle
Nixon Peabody, LLP
401 Ninth Street, N.W.
Suite 900
Washington, DC 20004
202-585-8338
ewhittle@nixonpeabody.com
Counsel for
The Retail Energy Supply Association

Dated November 24, 2014

WAS:213833.8

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Fed. R. App. P. 28(a)(10) and 32(a)(7)(C), that

the foregoing brief was prepared in 14-point Times New Roman font, and contains

13,476 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

and Cir. R. 32(a)(1).


*/s/ William Rappolt*
William Rappolt

Dated: November 24, 2014

58

WAS:213833.8

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. App. P. 25(d)(2), that on November 24, 2014, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record for this matter, who are registered with the Court's CM/ECF system.

*/s/ William Rappolt*
William Rappolt

Dated: November 24, 2014

59